UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Carol A. Kennedy,

  Plaintiff,

v.                    Honorable Sean F. Cox

Global Engine Manufacturing        Case No. 09-13585
Alliance LLC, a Michigan corporation,

  Defendant.

_____/

**OPINION & ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AS TO PLAINTIFF'S GENDER DISCRIMINATION CLAIMS**

  In this employment discrimination action, Plaintiff Carol Kennedy ("Plaintiff" or "Kennedy") alleges that her former employer unlawfully terminated her based upon her gender. The matter is currently before the Court on Defendant's Motion for Summary Judgment. The parties have fully briefed the issues and oral argument was heard on December 16, 2010. As explained below, the Court shall DENY the motion because Plaintiff has: 1) established a prima facie case of gender discrimination; and 2) submitted sufficient evidence from which a reasonable juror could conclude that Defendant's proffered reason for terminating Plaintiff was a pretext for unlawful gender discrimination.

BACKGROUND

  Plaintiff filed suit against Defendants Global Engine Manufacturing Alliance, LLC and Chrysler Group LLC on September 10, 2009. Plaintiff's Amended Complaint asserts the following counts against Defendants: "Age Discrimination in Violation of the Age

1

Discrimination in Employment Act, 29 U.S.C. § 621 *et seq*." (Count I); "Age Discrimination in Violation of the Michigan Elliott-Larsen Civil Rights Act, M.C.L. 37.2101 *et seq*." (Count II); "Sex Discrimination in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*." (Count III); "Gender Discrimination in Violation of the Michigan Elliott- Larsen Civil Rights Act, M.C.L. 37.2101 *et seq*." (Count IV); "Retaliation in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et *seq*." (Count V); and "Retaliation in Violation of the Michigan Elliott-Larsen Civil Rights Act, M.C.L. 37.2101 *et seq*." (Count VI).

Plaintiff later dismissed her claims against Chrysler. (Docket Entry No. 8). In responding to Defendant's Motion for Summary Judgment, Plaintiff agrees that her age discrimination and retaliation claims should be dismissed. (*See* Docket Entry No. 23 at 1). Thus, only her gender discrimination claims (Counts III and IV) remain.

This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary judgment

such that: 1) Defendant filed a Statement of Material Facts ("Def.'s Stmt.") and 2) Plaintiff filed a Counter-Statement ("Pl.'s Stmt.").

Summary judgment is proper when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In deciding a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In keeping with this standard, below is a summary of the evidence submitted by the parties, viewed in the light most favorable to Plaintiff, the non-moving party.

Defendant Global Engine Manufacturing Alliance, LLC ("GEMA") was a joint venture between Chrysler LLC ("Old CarCo"), Mitsubishi, and Hyundai. (Def.'s Stmt. at ¶ 1; Pl.'s Stmt. at ¶ 1).

Plaintiff was employed by GEMA as its Human Resources Director. (Def.'s Stmt. at ¶ 4; Kennedy Dep. at 111).

Plaintiff initially began working at GEMA in June 2008 as a contract employee through HR Management. (Def.'s Stmt. at ¶ 5; Kennedy Dep. at 99-100). Plaintiff was told that she would be brought on as an employee of GEMA if her performance during her first 90 days of employment was satisfactory. (Kennedy Dep. at 99-100).

Bruce Baumbach ("Baumbach") was the GEMA Plant Manager and was Plaintiff's direct supervisor. (Def.'s Stmt. at ¶ 11; Kennedy Dep. at 115-16 & 120).

Plaintiff testified that on September 15, 1008, Baumbach informed her that her work performance was superior and that she would be made a full-time employee. (Kennedy Dep. at

3

221-22). GEMA hired Plaintiff as a direct employee on September 15, 2008. (Def.'s Stmt. at ¶ 6; Kennedy Dep. at 111). Plaintiff testified that she was told that she was being hired as a GEMA employee, that she "was told specifically that [she] would report as a GEMA employee" and that she would report to Baumbach. (Kennedy Dep. at 115-16).

Fred Castelvetere ("Castelvetere") was an employee of Old CarCo, whose job title was Senior HR Manager. He was responsible for helping launch the GEMA facility and on behalf of GEMA he negotiated the collective bargaining agreement with the UAW. (Def.'s Stmt. at ¶ 18; Pl.'s Stmt. at ¶ 18).

In January of 2009, Plaintiff met Castelvetere for the first time. Plaintiff testified that, at that meeting, Castelvetere told Plaintiff that she reported to him. (Kennedy Dep. at 115-16 & 151). She testified as follows:

> A. . . . I introduced myself and then we sat down and within a minute or so he said, let's get something clear, and he stuck his finger right in my face, and he said, you report to me now. And I said, no, I don't. So we had a dialogue around that.
> . . . .
> Q. Okay. Where did the conversation go from there?
> A. The conversation – I said, I don't report to you. I report to Bruce Baumbach. And he said, yes, you do. And he said, all the HR managers report in to me. And I told him I'm not an HR manager. I'm an HR director. And I'm a GEMA employee. And – so the conversation continued in the vain. I was uncomfortable with the conversation. This is the first time I had met him. And all I wanted to do was just ease the tension at that point.
> Q. Do you recall any – anything else being discussed at this meeting?
> A. **Yes. He said he was not comfortable with women working in manufacturing.**
> Q. Now, this is – this is a senior HR manager who you're saying said to you he's not comfortable with women working in manufacturing?
> A. **Yes. He said women do not belong in manufacturing.**
> Q. All right. And did anybody overhear that statement?
> A. That was made in his office behind closed doors.
> Q. Okay. You realize how ludicrous that sounds. That somebody with 30

4

>
> years with a company who's in human resource management, who has promoted a number of women over the years, who knows what a protected classification is going to be, you're still contending that he made the statement, women don't belong in manufacturing?
> MR. FETT: Object to form and foundation.
> Q. You can answer.
> A. Imagine how ludicrous it sounded hearing that.
> Q. So you're standing by it, that he made that statement?
> A. I am absolutely standing by that statement.

(Kennedy Dep. at 124-26) (emphasis added).

Plaintiff testified that when she later questioned Baumbach about Castelvetere's assertion that she reported to him, Baumbach said "no, you don't report to Fred, you report to me." (*Id.*). Plaintiff testified that at no time did Baumbach ever tell her that she had a "dual reporting relationship" or that she reported to Castelvetere. (Kennedy Dep. at 117).

On January 23, 2009, Baumbach sent Plaintiff a letter enclosing a bonus check and stating "[t]his bonus award reflects your excellent performance in quality, delivery, costs, and morale business metrics for this past year." (Ex. B to Pl.'s Br.).

On February 10, 2009, Baumbach sent Plaintiff an e-mail stating, "I have revised your 2008 appraisal." (Ex. C to Pl.'s Br.). Attached to that e-mail was a "Goal Agreement 2008" that listed various team goals and indicated "Metrics are met" next to each goal listed.

Plaintiff testified that during April of 2009, she spoke with Castelvetere on the telephone and he made additional derogatory comments about women working in manufacturing:

> A. Yes. Fred called me on the telephone and was very angered and was yelling at me and using profanity on the phone, telling me that I was mishandling Union relations, wasn't specific, he had to clean up my mess. **He also told me this is exactly why women shouldn't be in manufacturing.** He was very inappropriate and unprofessional on the phone. . .
> Q. And his is in the April 2009 time period?
> A. Yes.

> Q. Now, you said Fred used profanity. What was the profanity that he used?
> A. He used the word fuck. He used the word you're messed this damn thing up. He's used multiple words like that.
> Q. Well, in what context – in what context did he use the word "fuck"?
> A. He said, you have fucked this up. He was tired of cleaning up my damn mess.
> Q. Now, you said this is when he said, this is why women shouldn't be in manufacturing?
> A. Correct.
> . . . .
> Q. Okay. Did he explain why he was making that comment to you?
> A. He told me that I was fucking things up and he was not happy. That's what he said.
> Q. Well, did he say, "And this is why women should not be in manufacturing"?
> A. **He said, and this is why women should not be in manufacturing.**

(Kennedy Dep. at 24-27) (emphasis added).

Plaintiff testified that she reported Castelvetere's inappropriate comments about women to Baumbach and others at GEMA. (Kennedy Dep. at 126-27, 148-151).

Castelvetere testified that he first talked to Baumbach about terminating Plaintiff in late April or early May. (Castelvetere. Dep. at 40). Baumbach testified that about six weeks before Plaintiff's termination he received a call from Castelvetere, who "basically said that – that things weren't working out." (Baumbach Dep. at 23). Baumbach testified:

> A. . . . I asked him, you know, what are you talking about and he said, well, I think we need to get rid of Carol because she just isn't right for the job. And he said, I'm – you know, what do you think and I said, well – I said, Fred, from my perspective which is a different perspective than his perspective, she's doing what I need her to do. Do I see as much movement on litigation, on grievances, you know, as I'd like, no. Is it moving in a better direction? I think it is. Is she doing the things that I expect from her? Coming to work every day, getting her group to help us with suggestions, getting her group to help us with communications, is she doing that stuff? She's doing that stuff. So I don't see everything you do.
> Q. Okay.
> A. I said, Fred, if we need to move forward then I need more facts. You need to give me more information. You need to tell me what is going wrong. And he said,

> well, he said, I just wanted to let you know I think we need to move in that
> direction. I'm still getting all of my facts together.

(Baumbach Dep. at 23).

Castelvetere terminated Plaintiff on June 9, 2009. Plaintiff testified that Baumbach came to see her earlier that morning, before she was terminated. (Kennedy Dep. at 60). She testified that Baumbach told her that Castelvetere was going to terminate her and that he did not support that decision:

> Q. What did that conversation consist of?
> A. He came to me early in the morning and he said that had been contacted by Fred, and Fred was coming down that day to terminate my employment. Bruce was extremely upset about it. He didn't support it. He said he had had conversations with Fred Gettel and he was going to make additional phone calls. But he didn't feel comfortable with the termination. He was very unhappy about the situation. And he was also contacting his attorney because he didn't want to be considered a party to this, and he was protecting his interest as well.

(Kennedy Dep. at 60).

After terminating Plaintiff, Castelvetere drafted a "Memo To File" regarding Plaintiff's termination. (Ex. M to Pl.'s Br.). The memo stated that "Carol inquired why she wasn't put on a 30, 60, 90 day review," and that Castelvetere "explained that the job simply was not a good fit. Also, she never accepted the reporting relationship up through the Corporate Office . . ."

Anna Barringer ("Barringer") is a GEMA employee who worked in HR and reported to Plaintiff. Barringer testified that Baumbach told her that he "didn't have a part in the decision of letting Carol go." (Barringer Dep. at 20).

## ANALYSIS

A. <u>Are Plaintiff's Gender Claims Time-Barred?</u>

Defendant's Motion for Summary Judgment asserts that Plaintiff's claims are time-

7

barred, based upon a contractual six-month limitations period.

When Plaintiff applied for employment with GEMA she signed and submitted a written "Application for Employment." (Ex. E to Def.'s Motion). Above the line for her signature, that Application for Employment stated, in pertinent part:

> In consideration of [GEMA's] review of my application, I agree that any lawsuit arising out of my employment with, or my application for employment with, [GEMA] or any of its subsidiaries must be filed *no more than six (6) months after the date of the employment action that is the subject of the lawsuit.*

(*Id.*).

Plaintiff's only remaining claims in this action are her gender discrimination claims, which are based upon her termination. Plaintiff was terminated on June 9, 2009, and filed this action on September 10, 2009. Thus, Plaintiff filed this action within six months of the employment action that is the subject of this lawsuit.

B.    Can GEMA Be Held Liable For Discrimination By Castelvetere?

Without citation to any authority, Defendant claims that Plaintiff's discrimination claims must be dismissed because the individual she claims discriminated against her (i.e., Castelvetere) was an employee "of a non-party, bankrupt Chrysler LLC" rather than an employee of GEMA, (Def.'s Br. at 3).

As Plaintiff correctly notes, both Title VII and Michigan's Elliott Larsen Civil Rights Act expressly define the term employer to include the employer's agent. M.C.L. § 37.2201(a) (defining employer as "a person who has 1 or more employees, and includes an agent of that person."); U.S.C. §2000e(b) (defining employer as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such a person.").

Although the term agent is not defined in Title VII or the ELCRA, it has been interpreted

8

by courts as an individual who exercises significant control over the plaintiff's hiring, firing, or conditions of employment. *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994); *Odigbo v. Northwest Airlines, Inc.,* 8 F.Supp.2d 660, 663-65 (E.D. Mich. 1998); *Jenkins v. Southeastern Mich. Chapter, American Red Cross*, 141 Mich.App. 785, 799-800 (1985).

Here, it is undisputed that Castelvetere made the decision to terminate Plaintiff and that he personally terminated Plaintiff on June 9, 2009. (*See* Def.'s Statement of Material Facts at 30 & 31.). Thus, for purposes of liability under both Title VII and the ELCRA, Castelvetere was GEMA's agent.

C. <u>Can Plaintiff Proceed With Her Gender Discrimination Claims?</u>

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on her discrimination claim. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Here, Plaintiff contends that she can meet her burden under the circumstantial evidence approach.

Under the circumstantial evidence approach, a plaintiff must show the existence of facts which create an inference of discrimination under the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Both parties acknowledge that the *McDonnell Douglas* framework is applied to gender discrimination claims brought under Title VII and the ELCRA and that Plaintiff bears the burden of establishing a prima facie case.

Once a plaintiff establishes such a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the Plaintiff's discharge. If the employer articulates such a reason, then the Plaintiff has the burden of showing that the

articulated reason is in reality a pretext to mask discrimination. *Skrjanc v. Great Lkakes Power Service Co.*, 272 F.3d 309 (6th Cir. 2001).

1. <u>Can Plaintiff Establish A Prima Facie Case Of Gender Discrimination?</u>

To establish a prima facie case of gender discrimination, Plaintiff must show that: 1) she is a member of a protected group; 2) she was subjected to an adverse employment decision; 3) she was qualified for the position; and 4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.2d 984, 987 (6th Cir. 2004).

In her Amended Complaint, Plaintiff alleges that she was replaced by a male. (Am. Compl. at ¶ 90).

In its Motion for Summary Judgment, Defendant challenges only the fourth element of Plaintiff's prima facie case. (*See* Def.'s motion at 12). Defendant asserts that Plaintiff cannot establish the fourth element because she has not presented evidence "that Defendant treated her differently than similarly situated male employees." (*Id.*). Defendant's motion does not challenge her ability to meet the final element by showing she was replaced by a male. Rather, it simply ignores that method of meeting the final element.

In response, Plaintiff notes that she can establish the fourth element of a prima facie case by establishing that she was replaced by a male. She then asserts: "Here, Plaintiff was replaced by a male and therefore has made her prima facie case." (Pl.'s Response at 15).

The Court agrees. It is undisputed that Plaintiff was replaced by Len Sennish, who is a male. (Defendant's Statement of Material Facts at ¶ 54; *see also* Docket Entry No. 21, personal data sheet showing that Len Sennish is a male). Thus, Plaintiff has established a prima facie

case of gender discrimination.

        2.        <u>Can Plaintiff Demonstrate Pretext?</u>

Once a plaintiff establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. Once a defendant articulates a nondiscriminatory reason for the challenged action, the plaintiff bears the burden to prove that the proffered explanation was a pretext for discrimination. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 354 (6th Cir. 1998). In order to do so, the "plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A plaintiff can refute the legitimate, nondiscriminatory reason that an employer offers to justify an adverse employment action by showing that the proffered reason 1) had no basis in fact, 2) did not actually motivate the defendant's challenged conduct, or 3) was insufficient to warrant the challenged conduct. *Wexler v. White Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003); *Manzer*, 29 F.3d at 1084. The first type of showing consists of evidence that the proffered bases for the termination never happened (i.e., that they are factually false). With respect to the second kind of showing, "the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." *Id*. The third showing consists of evidence that other employees, particularly those not in the protected class, were not fired even though they engaged in similar conduct. *Id.*

Here, Defendant offers the following as its legitimate non-discriminatory reason for Plaintiff's discharge: "Kennedy was a short term employee who GEMA terminated because of

her leadership skills, not being a fit for the job, because she fostered poor union relations and because of insubordination, since she refused to recognize her reporting obligations to Fred Castelvetere." (Def.'s Br. at 15).

Plaintiff's response seeks to show pretext in all three of the permissible manners and asserts that a reasonable juror could conclude that Defendant's justification for her termination was a pretext for discrimination.

First, Plaintiff contends that a reasonable juror could conclude that Defendant's stated reasons for her termination are false and that discrimination actually motivated her termination.

As to Defendant's assertion that Plaintiff was terminated for her leadership skills and not being a good fit for the job, Plaintiff directs the Court to the following evidence to establish the stated reason is untrue: 1) Baumbach's January 23, 2009 letter to her, enclosing a bonus check and stating "[t]his bonus award reflects your excellent performance in quality, delivery, costs, and morale business metrics for this past year." (Ex. B to Pl.'s Br.); and Baumbach's February 10, 2009 e-mail to her, stating, "I have revised your 2008 appraisal" and attaching a "Goal Agreement 2008" that listed various team goals and indicated "Metrics are met" next to each goal listed. (Ex. C to Pl.'s Br.). Plaintiff also directs the Court to Baumbach's testimony regarding his response when Castelvetere first mentioned terminating Plaintiff. Baumbach testified that about six weeks before Plaintiff's termination he received a call from Castelvetere, who "basically said that – that things weren't working out." (Baumbach Dep. at 23). Baumbach testified:

> A.   . . . I asked him, you know, what are you talking about and he said, well, I think we need to get rid of Carol because she just isn't right for the job. And he said, I'm – you know, what do you think and I said, well – I said, Fred, from my perspective which is a different perspective than his

12

>               perspective, she's doing what I need her to do. Do I see as much
>               movement on litigation, on grievances, you know, as I'd like, no. Is it
>               moving in a better direction? I think it is. Is she doing the things that I
>               expect from her? Coming to work every day, getting her group to help us
>               with suggestions, getting her group to help us with communications, is she
>               doing that stuff? She's doing that stuff. So I don't see everything you do.
> Q.            Okay.
> A.            I said, Fred, if we need to move forward then I need more facts. You need to give
>               me more information. You need to tell me what is going wrong. And he said,
>               well, he said, I just wanted to let you know I think we need to move in that
>               direction. I'm still getting all of my facts together.

(Baumbach Dep. at 23).

Plaintiff also contends that Defendant's stated reason of poor union relations is untrue. In support of that position, Plaintiff notes that Baumbach, her direct supervisor, testified that she did not have a problem with union relations when compared with others:

> Q.            Did you think she had a problem relating with the union officials?
> A.            I think everybody has a problem with relating to union officials. Did she
>               have more a problem than anyone else? No, I don't think she had more of
>               a problem. I think it's a matter of – it's a matter of comfort level. She
>               didn't come from the automotive industry so she dealt with union before
>               but she's never dealt with the UAW. So did she have difficulty with the
>               amount of respect that they wanted from individuals? She may have, yes.
> Q.            Did you ever get the impression they were jacking her around because she
>               was a female?
> A.            No. Do they jack around everybody? Yes, they do. Do we jack them
>               around? Yes, we do.

(Baumbach Dep. at 32-33).

Plaintiff also contends that Defendant's stated reason of insubordination, for having failed to recognize a reporting obligation to Castelvetere, is without factual support. Plaintiff directs the Court to the portion of her own deposition testimony, wherein she testified that she was told that she was being hired as a GEMA employee, that she "was told specifically that [she] would report as a GEMA employee" and that she would report to Baumbach. (Kennedy Dep. at

13

115-16). Plaintiff also testified that when she questioned Baumbach about Castelvetere's statement that she reported to him, Baumbach said "no, you don't report to Fred, you report to me." (*Id*.). Plaintiff further testified that at no time did Baumbach ever tell her that she had a "dual reporting relationship" or that she reported to Castelvetere. (Kennedy Dep. at 117).

Second, Plaintiff also relies on circumstantial evidence of gender discrimination to show prextext, including Plaintiff's testimony that Castelvetere made derogatory comments about women working in manufacturing. Plaintiff testified as follows:

> Q. Do you recall any – anything else being discussed at this meeting?
> A. **Yes. He said he was not comfortable with women working in manufacturing.**
> Q. Now, this is – this is a senior HR manager who you're saying said to you he's not comfortable with women working in manufacturing?
> A. **Yes. He said women do not belong in manufacturing.**
> Q. All right. And did anybody overhear that statement?
> A. That was made in his office behind closed doors.
> Q. Okay. You realize how ludicrous that sounds. That somebody with 30 years with a company who's in human resource management, who has promoted a number of women over the years, who knows what a protected classification is going to be, you're still contending that he made the statement, women don't belong in manufacturing?
> MR. FETT: Object to form and foundation.
> Q. You can answer.
> A. Imagine how ludicrous it sounded hearing that.
> Q. So you're standing by it, that he made that statement?
> A. I am absolutely standing by that statement.

(Kennedy Dep. at 124-26) (emphasis added). Plaintiff further testified that during April of 2009, she spoke with Castelvetere on the telephone and he made additional derogatory comments about women working in manufacturing:

> A. Yes. Fred called me on the telephone and was very angered and was yelling at me and using profanity on the phone, telling me that I was mishandling Union relations, wasn't specific, he had to clean up my mess. **He also told me this is exactly why women shouldn't be in manufacturing.** He was very inappropriate and unprofessional on the

14

| | | phone. . . |
|---|---|---|
| | Q. | And his is in the April 2009 time period? |
| | A. | Yes. |
| . . . . | | |
| | Q. | Okay. Did he explain why he was making that comment to you? |
| | A. | He told me that I was fucking things up and he was not happy. That's what he said. |
| | Q. | Well, did he say, "And this is why women should not be in manufacturing"? |
| | A. | **He said, and this is why women should not be in manufacturing.** |

(Kennedy Dep. at 24-27) (emphasis added).

Third, Plaintiff contends that Defendant's proffered reasons were insufficient to warrant termination. Plaintiff contends that she was not afforded notice and an opportunity to improve, through a performance plan or other similar measure, as were other salaried employees.

Castelvetere testified that "we put people on a 30, 60, 90, if people aren't performing their jobs, at least let them know what they're doing wrong or what they're not doing or what they're supposed to do." (Castelvetere Dep. at 46). He testified that GEMA had the same process. (*Id.*)

Plaintiff notes that when a male GEMA management employee (Peter Heider) was not meeting performance expectations, Castelvetere "advocated that Heider be placed on a 30-60-90 review so that goals could be set, observed and performance documented." (Def.'s Answer to Am. Compl. at ¶ 54). Unlike Heider, Plaintiff was not placed on a 30-60-90 review or given an opportunity to improve her performance. At Plaintiff's termination meeting she "inquired why she wasn't put on a 30, 60, 90 day review," to which Castelvetere responded "I explained that the job simply was not a good fit. Also, she never accepted the reporting relationship up through the Corporate Office . . ." (Ex. M to Pl.'s Br.).

Viewing the evidence in the record in the light most favorable to Plaintiff, the Court

finds that Plaintiff has submitted sufficient evidence from which a reasonable juror could conclude that the employer's proffered reason for terminating Plaintiff was a pretext for unlawful gender discrimination. Accordingly, the Court shall deny Defendant's Motion for Summary Judgment.

## CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Plaintiff's age discrimination and retaliation claims (Counts I, II, V, and VI of Plaintiff's Complaint) are hereby DISMISSED. (*See* Docket Entry No. 23 at 1; 12/16/10 Hrg. Tr.).

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment, as to Plaintiff's gender discrimination claims (Counts III and IV), is DENIED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: December 28, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on December 28, 2010, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager